There are a variety of issues in this case. I'd like to focus on the illegality of the underlying deportation relied upon by the government. I'd also like to touch on two issues as well about the arrest in this matter and the sentencing. So I would like to ask the court if I could reserve four minutes for rebuttal. Yes, but you should try to keep track of your own four minutes. Thank you. In this case, Your Honors, I believe the deportation was invalid and factually, invalid as a matter of law and factually nonexistent. For those reasons, I would ask Your Honors to vacate the conviction under Mendoza-Lopez because an underlying deportation that basically guts a respondent's rights to counsel and to appellate review cannot be used as a predicate element of a criminal offense. And I would like to ask the court if I could reserve four minutes for rebuttal.  Thank you. It's an amazing record. The INS and ICE failed to confirm whether or not Mr. Ramos wanted an attorney. They left nothing for appellate review except essentially a four-page paper document that they consider a waiver of fundamental rights and an agreement to be removed from the country. There is no indication that this was read or reviewed or even understood by Mr. Ramos. There is a signature. When it says that the chief counsel of ICE signed the form that found a voluntary knowing and intelligent waiver of rights, does he sign? What is that chief counsel considering? What's before him when he makes that finding? Was Ramos before him when he made that finding or is he just looking at paper and what? I can't remember. Your Honor, in my excerpt of records, the amended excerpt of records, you have Deportation Officer Olson testifying as to what she thinks that other officer is doing when that stipulation is signed. That person, she says, does not see the respondent. They may or may not have the A file in front of them. So they haven't queried the respondent. We don't know. There's no proof that the A file was reviewed. And certainly there's no proof that an immigration judge ever saw the A file. And I can reference the, under Appellant's Additional Exit of Records, the very pertinent testimony is stemming from pages 145, I would say, through 175. And she did indicate that the officer you're speaking about, there's no, I mean, there's no proof in the record that that person ever reviewed Mr. Ramos' A file or that the immigration judge did not. So it's based entirely on these documents, the interview by Olson and the signed documents? Yes. And Olson was very candid and said basically she does not speak Spanish. She has no history of education in Spanish in grade school, high school or college, only a period of time with the Department of Homeland Security getting some training in Spanish. There's no recording of what was said to Mr. Ramos. We have no idea who, what the name is of somebody who may have even read this document to Mr. Ramos. If it did occur, she said it happened in a group hearing, which this court has held, you know, mass waivers of appeal and counsel are disfavored. We don't even have a recording of that in this situation, so there's no factual proof of it. She says on my Excerpt of Records, the amended one, page 159, the translator in the district court translated what she says she said to Mr. Ramos. And she said, you want court sooner possible? You want court sooner possible? And when asked by the district court what she said with regard to that, she said, basically what I just said before, do you want a hearing as quickly as possible? This is extremely misleading. It's telling the respondent he's going to have a hearing. He can just have it quicker if he'd like. She's not telling him the truth. But she's signing him up for removal and he would be out the door, outside of the country within 24 hours. Essentially, it's fraud. On page 163 of the Excerpt of Records, Ms. Olson is asked again to read what she said to the respondent. She says, as I said before, I ask him if he wants to fight his case or if he wants to sign. Now, that's indicative, again, of a non-intelligent, unknowing waiver of one's rights. She doesn't even tell him what his rights are, and she's just saying, does he want to sign or does he want to fight his case? He's not even being told how he might be able to fight his case. When I asked in the district court if the interpreter in the courtroom could translate what she said into English, the interpreter said, Your Honor, it's nonsensical in part. I don't know. I wouldn't know how to translate certain parts of that. This is a federally court-certified interpreter who couldn't even understand her Spanish. He says at the bottom of page 163, it sounds like she's saying, Do you want to fight your case or do you want to sign the stipulated? It sounds like that. In the court, Judge Gonzalez, who apparently speaks Spanish, said, Right, that's what it sounds like. That is not sufficient as a matter of law or even factually that this person knew what his rights were or validly waived them. There's nothing in the record saying that he was actually explained to and understood and imbued his rights to have a public review, to have a record, to be able to present his own evidence, or to have counsel at his side to tell him what his options were. Why do you say that if there's a violation, there's no requirement of prejudice? I'm sorry, Your Honor. Why do you say there's no requirement of prejudice? I think that when you deny somebody counsel, that's so fundamental that there should be no prejudice. Everybody, of course, in our legal system is entitled to prejudice. But have you read our cases that seem to say that you do? I mean, you don't address those cases at all, either in your opening brief or your closing brief. Which cases? Cases that say, okay, you start from the proposition that there was a due process violation. Nevertheless, there must be a showing of prejudice in order for that to be cognizable in this context. Okay. You just don't address those cases at all. I don't know those cases, other than the one that Ahur Mata agonized. They're in the red brief. They're in the red brief. In the government's brief. Right. Yeah. Did you read that brief? Yes, I've read it several times. And it says that you have to show prejudice. It cites all kinds of cases. Your Honor, there is prejudice. There's two forms of prejudice. One, the main prejudice, of course, is that having not knowingly and intelligently supposedly signed this document and agreeing to be removed, Mr. Ramos is facing up to 20 years in prison and received a huge sentence simply because he was told he did some stipulation. Have you read the cases that talk about the requirement of showing prejudice? Because you're not addressing what those cases say has to be addressed. Your Honor, I probably have read those cases. You probably have? I've read similar cases in preparation for this appeal that I was focusing on something else. But there is prejudice. He could have received 212H relief. Okay. Now you're starting to talk. How is it that he could have obtained 212H relief? I just found a case last night that I think his only problem was the drug convictions. Yeah, how about two? Doesn't that render him ineligible under 212H? Under United States or Karachuri, let me find it, Your Honor, versus INS. I found this after I drove up here last night, Your Honor. Matter of Karachuri, 24INN, Decision 382. 24INN, Decision 382. If the record of conviction does not identify the specific controlled substance for conviction under Health and Safety Code 11377 or 11350, and he supposedly had two 11377 convictions, it is not a controlled substance offense for immigration purposes. Now, wait a second. This is a – you're now making an argument that you didn't make in either one of your briefs. Yes, I did. And you're giving us a case that you haven't told the other side about or us about or anybody about. I can withdraw from life, but I found this last night. I typically tell the government everything I find, but I feel a little weird not knowing this case. You feel a little what? Weird. Remiss. It's rather remarkable that you didn't address this in your – at least your reply brief. I didn't know. I didn't know the holding of this case, Your Honor. Well, but the government – I was looking through an Immigration Legal Resource Center publication yesterday while I was still in San Diego. I saw a blurb about it. I asked Robert Swain, an expert in immigration law. Is this competent representation of your client? I don't know, Your Honor, but – When was this case decided? Can I continue? I'm sorry. You gave a citation, but not the time. What's the date of the case? It's 2007 from the BIA. And it says – and this is what I don't know with the record, so we may have to remand – is that if the records of convictions – I'm assuming these are the judgment and convictions – do not have – do not contain the actual name of the drug – Have you seen them? Do you know what you're talking about? I have seen them, but I didn't know about this case, so I wasn't looking for them, and I don't remember. So you don't – The probation officer has the records of one of those convictions. But you can't tell us – you can't even tell us whether this case applies because you don't know anything about the convictions. Right. But I'm raising it now, so I will not have this come back at me later. Well, let's assume the records of conviction do show the substance, the nature of the substance. Then where are we? Then I think that either it's such an egregious violation of his due process, his regulatory and statutory rights, this manner in which he was removed from the country with such a huge penalty that I don't think you need to find prejudice. This is a person who tried to go through a legal agenda. But there's no case that supports that. But there's also – I'm sorry. But you have both a due process argument, and then you also have the argument that the ICER, DHS, violated its own internal regulations because they clearly provide that if the client is not represented by counsel, then he has to go before an IJ. And here he went to the chief counsel. Do you have to show prejudice when the INS has violated its own regulations? Based on Judge Trott's opinion in RAM and the cases related to it that I have cited in my reply brief, I don't think you've decided that. This Court hasn't decided it. I think there's a court's circuit split on that. If they violated their own regulations, then I think there's – we're not talking due process. Due process, I think, requires prejudice. That we're talking about they violated their own regulations, so therefore was this a legitimate stipulated removal proceeding. I believe it wasn't even a stipulation. Yeah, I mean, what is the law? The law – I am – The law – Section 1003.25 of the Code of Federal Regulations requires the immigration judge to ensure the person has validly waived counsel and that there is a record for review. And it goes on – I think those laws were – those regulations were broken. But it says if the client's unrepresented, which yours was, right? No, he was not represented. Okay. Then he must be taken to an immigration judge, right? That is correct. And he wasn't taken to an immigration judge. Yes. Okay, so there's a violation of their internal regulations, and apparently that's the routine practice at Eloy. It is a routine practice, according to Kara Hartzler, the affidavit I provided from somebody who has personal and professional and probably expert experience there. I would say I've asked the Court to do this, and I would reiterate it again. It's going farther than you need to go, but I would ask that you deem these regulations unconstitutional. Why is the regulation unconstitutional if it's followed? If it was followed, either he would have counsel or he would go before an I.J. and you wouldn't have this process of paper shuffling with the court people. Because the regulations provide too much discretion in the hands of the prosecuting agency, the dominant party in this matter, and they are acting as immigration judges. They're acting at the same time as advisors, supposedly, to the respondents, and it's far too much discretion and leads to arbitrary enforcement as what's occurred here. That's why I would deem it unconstitutional on its face, but minimally as applied, as you said in this case, where they broke their own regulations. Right. But so do you have a case either way in whether you have to show prejudice if they violate their own regulations? I think, to me, if they're violating their regulations, then that's the end of it. They violate it. It's not a valid stipulated removal. I don't have a case that says that. I would like this to be the case that says there is no valid legally or factually removal in this case. There's no stipulation. But do we need to even get to the constitutional issue if they violated their own regulations? I'm sorry. I didn't hear you. Do we even need to reach the constitutional issue if they haven't abided by their own regulations? That's what I was saying, Your Honor. I don't believe you even need to go that far. But I do not have a case. Maybe Your Honor does. But I do not have a case that says once they violated their own regulations So I don't have a case. The whole system is in ruins, basically, because of the way they handle this and the way they mislead by deceit and fraud people into signing something that does prejudice them enormously if they are returned. If he had returned without having signed that, if he had just been removed physically from the country as the Border Patrol frequently does hundreds of times a day, he would have simply been facing a charge of 8 U.S.C. Section 1325 where there is no enormous enhancement. And it's typically a misdemeanor. It can be charged as a felony if you have a predicate misdemeanor for the same thing. It's a huge, huge prejudice. It's enormous. And they're tricking people into doing this and not telling them the consequences, what's going to happen. And at Eloy, they should know better because they're right at the border and they're deporting everybody solely to Mexico. They know people are going to come back. And they're tricking them and using people who don't even use, who don't even speak the Spanish language, and they don't even have proof that they're advising people what stipulations they're supposedly entering into. There's not even a tape recording. There's not a transcript of anything. The designation officer also just said, well, somebody does a group reading to the respondents. Presumably that was done. But there's no proof. The time is well up. Not only did we save you four minutes, you went over, but we'll give you a little bit of time. All right. Thank you, Your Honor. Eric Best. Good morning. My name is Eric Best, and I represent the United States. I'd like to address some of the questions that the panel had of opposing counsel right off the bat. I'm unaware of the case that opposing counsel cited as a new authority.  Is 212H relief precluded because of the defendant's prior convictions for possessing methamphetamine? And as I understand counsel explaining it, if the judgment, if the charging document does not include the name of the controlled substance, that might be an issue. It's not an issue in this case. The PSR is clear that he was charged with possessing methamphetamine. The second amendment to the PSR includes the actual charging documents. I just had a moment to look through it, Your Honors. You'll see in there. It's very clear he was charged with possessing methamphetamine and was convicted of that offense twice. And you're pointing to the excerpt of record? Your Honor, it's in the PSR, not in specifically numbered excerpts of record. As I understand it, the PSR was submitted to this Court pursuant to this Court's procedures while the briefing schedule was going on. So I don't have a record citation, but I do cite it in my brief to the PSR at various pages. In this document? That's correct. What page? I would direct Your Honor to pages 2 and page 4. And there's also another document which, again, I may be wrong. Possession of controlled substance meth? Correct. Page 2? And also on page 4. Again, it's maybe my fault. I assumed when the – Possession of controlled substance meth, again. Yes, Your Honor.  I would say, Your Honor, that this Court has consistently held since the Kroot-Tobar case that in order to attack an underlying deportation charge, it has to submit a charge    And Kroot-Tobar was an in-bank case? That's correct, Your Honor. That both a due process violation must be shown, not simply a regulatory – a failure to comply with regulations or a failure to comply with statute. An actual constitutional due process violation must be shown, and there must be prejudice. Now, I acknowledge that there are – there's the statement in a number of the cases cited by the appellant that there appears to be an open question in this circuit. It hasn't been decided where there's been an actual deprivation of counsel. The right to counsel has been deprived of somebody. That is an open question. There's statements in several opinions saying that we haven't decided where the prejudice is required. Some of those cases are long before Perot-Tobar. Some are. Some are after. And I would submit, Your Honor, that as I understand it, the issue in those cases was – and a deportee was actually – had counsel. Had counsel at the deportation hearing or at the immigration hearing. And then there was a continuance, and the counsel was not present at the continuance, and yet the immigration officer continued with the hearing. So the question in those cases was not was there a waiver of the right to counsel. It was the actual deprivation. I had one of those cases. You're absolutely right about what the setting was. And so that's my – that's how I view these cases, that it's still an open question. The government's position would be there still needs to be a showing of prejudice, and that would be our position that we advance. And we think there's good reason for that, because as this Court explained in Galicia-Gonzalez, it's not every jot and tittle of the immigration code that needs to be complied with in order to sustain a conviction under 1326. In order at this point to collaterally attack a conviction for illegally coming back into this country, the appellant must show both that there was a deprivation of due process rights and that that deprivation caused some prejudice somehow. Are you arguing that there was not a deprivation here? Yes, Your Honor. We're arguing under both the document itself, the signed written waiver of rights. We submit that that was sufficient on its face to demonstrate that there was no deprivation of the process. Wait a second, counsel. This is of serious concern to me, because the reason the government enacted this provision that if an alien is unrepresented, the immigration judge must determine that the alien's knowing and intelligent is precisely out of a concern for due process. The legislative history behind that says we're concerned that, you know, with the stipulated removal procedure violates due process with an unrepresented alien. I'm getting this wrong. If the alien is represented by counsel, then the counsel can advise them and assure them and make a statement or a representation to the IJ that this is no involuntary, etc. But the reason they enacted this particular CFR 1003.25 was because of a concern that if the alien wasn't represented, then his due process rights were violated. May I address that in two parts, Your Honor? First is that the Congress specifically enacted a provision that provided for a means by which an alien who wishes to be immediately deported, who wishes to stipulate the deportation, there should be a process set out for that. Right. And so Congress enacted that statute. I submit. For the benefits of the people who wish to be deported. And I submit, Your Honor, that that process is sort of undermines the design of Congress if in every one of these situations where somebody wants to avail themselves of stipulated deportation, they have to still have a hearing before an immigration judge. No, it's either or. It's either they have counsel or they get some quasi-judicial determination that their waiver, that, in fact, they really do want to return to Mexico and they do want to waive their rights to counsel until a hearing and to everything else, and that they're looking eye to eye with someone, either an attorney or an immigration judge, and making those statements. That's a very minimal level of due process. And I would submit, Your Honor, that the regulation that Your Honor read from, 1003.25b, it says that you're absolutely right, that the immigration judge must determine if the alien's waiver is voluntary, knowing, and intelligent. It does not specify how that determination should be made. Well, it certainly doesn't say that the chief counsel for ICE gets to determine it based on documents and representations by people who can't even speak Spanish. That's not what the government's arguing, Your Honor. The government is relying on. Well, that's what happened here. That's what happened here. Yeah. This process was a disaster. There's no way you would say this is the way it should be done. Well, if I could just answer. He's arguing that this is the way it should be done. He says there's no problem. I know. If I could just answer your question, try to answer your question. I think this is a really losing argument that you're making. I think you're better off on. And also, which judge handled this case? This was Judge Gonzales. Yeah. And you've got Judge Benitez. Is he in the Southern District, too? Correct. Judge Benitez seems to think this violates due process from the Vassallo-Martinez case. I think, Your Honor, that there's a distinction between these cases. Not a lot. Well, in the district court, the government relied on, first, the actual signed,  And so, in this case, the defendant had been advised of his rights. He had been advised of his rights. Again, it's written in English and in Spanish, and it's signed by the appellant. We also called the – and under Galicia-Gonzales, we argued that that was sufficient on its own to sustain the government's burden, that the defendant then had a burden of production to say something. But Galicia-Gonzales involves an alien who was represented by counsel. And you rely on a whole bunch of those cases. You just try to ignore the fact that Ramos wasn't. I think, Your Honor, it's significant that the stipulation in Galicia-Gonzales was not even signed by the appellant. It was not signed by the appellant. It was a statement in there that it had been explained to the defendant and that the defendant understood his rights. But you're disagreeing with me that Galicia had counsel. No, absolutely, he had counsel. And that's significant, that he had counsel and the counsel signed the stipulation. In this case, we had the defendant himself signing the written stipulation. We didn't – Which is more – it guarantees more due process than if he had had counsel. Is that what you're saying? No. I'd say that it's clearer that he had – he was advised of his rights because he signed a statement in which his rights were spelled out and that he acknowledged waiving those rights. Again, the document's written in English and Spanish. But we didn't rely only on the document. We also called the deportation officer who sat down with the appellant after, again, the context is a group setting, yes, but an individual who speaks Spanish fluently explains to all the aliens in the room that you could see an immigration judge. It will take several weeks. Mrs. Olson or was it someone else? Somebody else. Somebody else. Mrs. Olson says that this is the way it's done. She's present for these deportation hearings. It's the same process every single time. But another individual who speaks Spanish fluently explains that the individuals can ask to see an immigration judge. Who extracts the waiver from the person in the group? So then after the group has read the document in Spanish and explained, here are your options, here's what's going to happen, then deportation officer Olson actually sat down with the appellant. She said that she speaks English if the person can speak English. She speaks in Spanish if the person can understand Spanish. Her Spanish is a disaster. Can't speak Spanish. I submit, Your Honor, that her pronunciation is bad. Pronunciation? Well, because the district court said the pronunciation wasn't good and I couldn't understand it. But the translator did actually translate, do you want to see the immigration judge or do you want to sign the stipulated? And, again, the district court made a factual finding, Your Honor, that I would remind Your Honor. You say it's like Miranda. We do this all the time with criminal suspects. We don't make them go before any judges, right? I'm not making that argument. It kind of sounds like it. The district court did make a factual finding that if Ms. Olson did not think the deportee understood what was going on, she calls over somebody else to have them explain. If the deportee at any stage does not appear to understand what she's saying, she crosses out the paperwork, and that's how she was able to conclude. What kind of guarantee is that? Does not, to her mind, the alien does not appear to understand? If he is speaking Spanish and she barely speaks Spanish, how does she even know that? Again, Your Honor, I would submit that she can pretty much determine that the person is not responding to her questions, is not, they're not communicating. Who exactly is she? Excuse me? Who, I mean, what is her title? She's a deportation officer. She's with the Department of Homeland Security. I guess it really boils down to what we think the regulation requires. I think on the issue of whether there's been a violation of due process, I think that's probably right, Your Honor, because the regulation actually require a face-to-face meeting with the immigration  And I would submit, Your Honor, that it doesn't, that it doesn't need to because they're in certain circumstances, and I guess the service is given a little bit of discretion as to how it wants to comply with the regulation. But in this case, a written waiver that's read aloud in the native language of the deportee, and there is an individualized setting, albeit not perfect, and I would, you know, I would agree with Your Honor that it wasn't a perfect setting, but that there were sufficient guarantees that the appellant understood what he was doing and that he chose the path of being immediately deported because then he would not remain in custody for several weeks. So our position, Your Honor, is that we have sufficient guarantees. So, all right. Let's assume there's a violation. On prejudice, Your Honor, we believe that the appellant cannot establish any prejudice. He was statutorily ineligible for relief under 212H. That's the only ground that was really raised below in the district court. That was statutorily. That's the only ground that's raised here. As I understand it. He also, that's pretty much the end of the discussion. And this Court, if, I mean, we raise additional arguments in our brief, I would submit on those, but I would say that being statutorily ineligible for 212 relief because of his two prior methamphetamine convictions renders it clear that he could not have changed, obtained a 212 relief and avoided being the deportation in this case. I'd submit that he also failed to present sufficient evidence on the equities, the extreme hardship that he would have to show in order to get 212 relief. And just one point of clarification, there are a number of items in the appellant's excerpts of record purporting to explain the hardships that would have befallen his family if he was deported. Many of those materials were not before the district court when the district court issued its ruling. Some of those were presented after the district court issued its ruling, later in the proceedings, that the record was supplemented to have those. But I think the district court correctly concluded that the declarations, to the extent they addressed the issue of extreme hardship, they were never marshaled to explain to the district court how these things show extreme hardship beyond what this Court found in Arce Hernandez, if I'm pronouncing it right, beyond the sort of normal, unfortunate consequences that befall a family that is associated with a deportee. So on those grounds, there would be no prejudice. There is no way he could have obtained a relief from his deportation. There are additional arguments that I'm prepared to address, if Your Honors wish me to, but I see that I'm out of time. And so if there are no further questions, we would submit. Thank you. Thank you. I'll give you another minute or so. Okay. I will try to be fast. I need to make several points. I think something that's helpful. Okay. Just so you know that I believe the standard is that the conviction has to show that there was a drug other than 30 grams of marijuana. We have not seen the conviction paper. Would you write that case down on a citation? And further to that, is there a record of the judgment of conviction of either one of the methamphetamine charges? I don't have them. The probation officer has them. Is it in here? Is it in the record? Oh, is it in the record? I don't think either myself or the government put it in. I can't totally speak for Mr. Best, but I don't believe it. Well, so the PSR is not enough? No, I don't think the PSR is enough. It just says methamphetamine. What you think is interesting, but is there anything that says the PSR is not enough? There are cases that I can draw for you that say the PSR is not a reliable document to rely on for fundamental things. It's okay to sentence somebody, but that's for nothing else. Were there any challenges made to the PSR? No, because I didn't know. Honestly, Your Honor, I didn't know this law at the time. There were challenges made to the PSR. Okay. Thank you very much. Thanks. Okay. Would you please write down the case citation for counsel and for the court? Did you hear me? I'm sorry. I just was asking, would you please write down the name of the case and the citation for counsel and for the court? Yes, I have it, and I can give you as well. No, just write it down in the citation. Do you know what a 28J letter is? I can do that. I haven't even read the case, but that's what the document, the Immigration Legal Resource Center for Florida had said. So I just had it last night. Just give the clerk a copy of that also. Oh, okay. I'll do that right now. Can you spell strictly? Do you need it? I need it. Okay. Thank you. Case to start will be submitted.
judges: Reinhardt, Trott, Wardlaw